All right. And when you are ready, we are ready. Our first case is Black v. Occidental Petroleum Corporation 22-8040. Good morning, Your Honors. My name is Lauren Moskowitz, and I am representing the appellants, the Occidental and Anadarko defendants in the case below. There's been a lot written in the briefs, and you'll hear a lot more today about presumptions and what presumptions do or do not apply. Your Honors, there is only one presumption that applies in this case, and that is the presumption that cases are to be tried by and on behalf of individual parties, not as a class. Class actions are the exception to the rule. And that quote appears in every single class action certification case, but you're almost tempted to skip over it. You can't. That is the key issue here. Plaintiffs bear the burden to overcome that presumption. They have to prove, not plead, not presume, but prove on a common class-wide basis how they are going to establish the elements of their claim. And the plaintiffs have failed to do that here, and the district court failed to conduct the rigorous analysis that the Supreme Court and this court's precedents demand the court do. The court made a series of legal errors in certifying this class, both on finding that the plaintiffs could establish market power on a common class-wide basis and antitrust impact on a common class-wide basis. Those issues are critical. Individual issues will predominate, and the 23B3 issues cannot be overcome by the plaintiffs in this case. Let me ask you this. If we conclude that the district court applied the correct legal standard, then the standard of review for us is abuse of discretion. Is that correct? That's correct, Your Honor. And is it your position that the court did not apply the correct legal standard? Yes, Your Honor. The court made a series of legal errors in analyzing these issues, but the court also abused its discretion in failing to actually conduct the rigorous analysis that was required. The legal errors include, for example, and I think the big one that we'll talk about today is the misreading of this court's decision in Wray-Urethane. The court made the legal error that effectively impact, antitrust impact could just be presumed and skipped over and that the plaintiffs need not offer actual common evidence to establish that antitrust impact element on a class-wide basis. That was a legal error that the court made. Urethane does not stand for the position that a plaintiff, class or otherwise, can just skip over establishing antitrust impact. That has been and remains a individual element of establishing liability under the Sherman and then the Clayton Act, as the plaintiffs have to bear the burden to show here. Urethane was a price-fixing case. Your Honors know probably better than I about your section one conspiracy price-fixing. Absolutely, Your Honor. There was a price-fixing conspiracy in one market where all of the plaintiffs were participants, buyers in that market. And what the court said is looking at decades of economic theory, decades of precedent. The courts, they have recognized that time and time again, plaintiffs can and have offered methodologies to demonstrate, not to just presume it, but to demonstrate that you can show that the class as a whole of participants, of buyers, have suffered a inflation of a baseline price. We don't have a price-fixing case here. We don't have one market for widgets here. We have 560 markets by the plaintiff's own analysis. Well, I think you kind of take that expert's statement out of context because he goes on. He never suggests 500 separate markets. There's one, the Laramie Formation, and then two sub-markets is what they're arguing for here. And I think that's a fair reading of that expert's testimony supports that, not 500. Your Honor, I disagree, and let me try to explain why. So yes, he starts with the Laramie County. And there are individual sections within Laramie County. And then he says, each of those sections has to be looked at individually because they are different. And then he says, that's okay though because I can regroup them by these two competitive dynamics, whether it was adjacent to one or two Anadarko leases. But he does drill down and say, each of these sections is individual. He just says it doesn't cause him problems because he can regroup them. Aren't they more individual for damages purposes? Isn't that where that really makes a difference? Your Honor, it certainly makes a difference for damages, but it makes a difference for market power and for impact as well. Market power has to look at all of the competitive dynamics of the market. Who are the competitors? What are the barriers to entry? What are the factors that go into whether and to what extent someone is gonna transact in that market? Of course, plaintiffs did none of that analysis. They just skipped because they got to 100% market share, which we think was inappropriate and was a manufactured way to avoid these very complicated questions. But just looking at market power, whether individual section was right next door to active drilling by an existing operator as compared to a section in no man's land on a puddle of water, what the competition and what the interest of competitors and entrants will be will be different. And that is exactly why these sections are individual. And the same issues, really similar issues, are the same issues of why not every plaintiff will be impacted at all or in the same way. Because the plaintiffs do have to show here, antichest injury, their theory, is that they were not able to transact, that they were not able to lease their minerals. And so to show that, they do have to explain on a common basis, but even if we're on an individual case, they will have to explain that they would have leased absent defendants leasing conduct. That is the only conduct that is currently allowed to be alleged to be anti-competitive. And so to understand whether that would have happened, they do have to look at what the nature of that land was. The plaintiff in this, I've called it no man's land, sitting on the puddle of very saturated land will not have the same opportunities, may never have been approached ever compared to the one right next door to EOG's active drilling activity. Is it your position if there's any member of the class that doesn't suffer an antitrust injury that the class is inappropriately designated? No, Your Honor, there is a lot of cases that are discussing this issue. It's really batting around in the courts right now. I don't think that the right answer is that a single class member who has shown that class certification not to have suffered antitrust injury defeats class certification. What we do think is that they have to have a common methodology for showing. Well, their common methodology is these intra-company leases artificially restricted access for drilling because of the prevalence of Anadarko in the area so that it effectively shut down leasing in the area, thereby depressing the value of the mineral interest throughout the formation. I mean, isn't that the theory? It's not, Your Honor. That is how the district court misunderstood their theory and said that's what their theory was. It's what they say their theory is. No, Your Honor, they repeatedly say that their theory is that they were unable to lease, not that the value of their minerals were reduced, but that they didn't get a lease. Their own damages model, which isn't exactly before the court because the district court rejected it, but their own damages model, which was their way of showing what the harm was, was based on a loss of lease bonuses and royalties, not a reduction in value of the minerals. That is not their theory. Or the mineral interest. Or the mineral interest, Your Honor. They really tried to live with what the district court said, but that hasn't been their theory, and it isn't their theory, and it won't be when we get back down to the district court. And so the real issue is that where this uninjured class member problem will arise is down the road when we get to shut, we have a constitutional right to show individual class member by class member, cross them out one by one. We get to do that. That is our right. The district court said we wouldn't get to do that, that all we would get to do is make a few examples to try to rebut this presumption, and that we will either win everything or we will lose everything on impact. But that's not the point. Well, because the district court said that the arguments that you're making apply class-wide, right? They don't, though, Your Honor. They really don't, and that's the issue. The individual issues that we will be presenting is John Smith, in this puddle, in no man's land, never would have been able to lease that property. Jane Doe, maybe she would have. Maybe we're gonna look at that. She has all these great facts that says, yes, I was approached and they said, just if only that Anadarko lease wasn't there, we would have been paying you a whole bunch of money. That's a hypothetical plaintiff in the class, but there are lots of class members that we're gonna have to get to show on a one-by-one basis that they were not impacted at all, not just the damages issue. They were not impacted at all. So John Smith's gonna be able to say, mine may not have been as good as Jane Doe's, but their 30% royalty rate on the adjoining parcel still caused mine to be worth even less. Your Honor, but they are not claiming worth less. They are claiming a failure to get the lease. And if the baseline for that individual was zero, he's never gonna lease it, then there can't be impact from us adding the lease on. Was there any type of evidence at the class action hearing that they had no lease offers, that there were no landmen out there seeking to lease their land? Your Honor, there are various evidence based on individual sections. That is our point, is that there will be testimony on specific sections, and then there won't be on others. And that is why the individual issues will predominate. These individuals are not market participants. They are non-participants in a series of alleged markets, even if it's two, they are non-participants in that market. And what this court has said, and what many courts have said, is you have to really look carefully when you have a non-participant, that there is a speculative nature of the injury claim when you do not have participation in the market. You've seen that on antitrust standing grounds, on this court's decision in Montreal Trading. You see it in antitrust cases, the Weld-Butrin example that we had in our papers, out of circuit, but it was a really good exercise in looking at, there were two groups in the class, purchasers of the generic, as soon as the generic drug was on the market, and people who didn't purchase the generic right away. They said, well, we would have, but for the action, but they didn't on day one. The court said, yes, class can be certified on impact for the purchasers, but more is needed. Individual issues would predominate on why the non-participants really can show that they would have participated. That's exactly what we have here. Did Anadarko drill any wells in the area? Yes, Your Honor, and so did other operators. That's part of our great proof about how impact is not common. The other operators, in fact, did come in, and sometimes we consented, and sometimes we were force-pulled, and that varied across the area, and the other thing that varied was whether we had a APD, an Application for Permit to Drill. That has been found by the district court to be immune from antitrust scrutiny, and so which properties had APDs, and whether that was actually the cause of the lack of leases versus the lease. That is a big issue that is going to be individualized. I'm happy to answer more questions. I would also love to reserve my last minute of time for rebuttal. Thank you. Thank you. Good morning, Your Honor. Samuel Zagbrock on behalf of the Plankton class to tell us here. Your Honors, we are here on a 23F petition, which asked this court to review the actions of the court below in certifying an issue class for liability questions under 23C4. The petition for this court's review claimed that the reason for this court to take this up at this point was that the district court had failed to properly apply the materially advanced standard which has been used by every circuit court and by the district courts in this circuit for 23C4 certification. In Ms. Moskowitz's presentation today, as in her brief, that issue has dropped out altogether. The word 23C4 was not mentioned. There was absolutely no reference to what the district court did in terms of certifying an issue class. There are questions that individuals may have different damages at various points. Those were expressly carved out by the district court's very careful analysis which found that contrary to our position, we did not establish the predominance on the damages component, and therefore, she would not certify this case under 23B3. Now, we did not agree with that because the history of these cases, and we'll start with your thing in the antitrust context, but the history of these cases in this court establishes that even when there are damages that have to be calculated on an individual basis down the road, 23B3 is appropriate, and that was the statement of this court in your thing. It upheld the lower court in your thing which found that handling liability would materially advance the inquiry and deal with the damages at secondary phase. This court upheld the trial that took place on that basis. In other contexts, this court has done the same thing for example, in the Naylor Farms case, which is, it's not in the briefs, but it's 923 F3rd 779. In Naylor Farms, the case, the court was dealing with a case almost identical to this. There was the question of the treatment of gas for resale, and there were charges made that of inappropriate taxing of costs on to the lessees of the land. Fine, the objection raised by the defendants to class certification, the objection was, we're gonna have to go wellhead by wellhead because some wells produce really good quality gas that may have been more effective. Some wells are the pools, puddles, as we just heard, and they don't produce anything of value, so we have to do well by well. This court said no. The district court made a finding, and here again, the court has to defer to these findings under all the jurisprudence of this court. The district court made a finding that you could establish the liability across the board, and then come back and revisit on the question of the individual damages. Okay, let me ask you, so what was your evidence below that your clients didn't receive lease offers? The evidence was testimony of, or declaration put forward by experts that there was no leasing activity except in a few exceptional circumstances. If there was some trade-off that Anadarko needed or things of that sort, the evidence was that leases were just not available. That was put forward by our main plaintiffs. That was put forward, we had landmen trying to track this down in order to make sure that every class member had no leases. That's what was key. My question is not were there any leases, were there lease offers, because that's different. Yes, I don't have the answer for that. Okay, because isn't that a problem for you if there's no evidence of lease offers one way or another, because they claim that there are lease offers that you may just be dissatisfied with the amount offered? Yes, that is a position that they assert. They put in no evidence on that score, none whatsoever, Your Honor. But let's assume that's the case. That's still an antitrust impact. As this court said in your thing, when you have a market-wide conspiracy, I don't disagree with you that it's not, it may be antitrust impact, but it's not the impact that you've alleged. I mean, you've alleged no leasing. Well, we've alleged no leasing as an element of the reduction in value of the class's mineral interest. That has been our position. And I was surprised, I mean, apparently that's not what you're arguing. I'm as surprised as you are, Judge McHugh, because I was there a year ago in Wyoming, and that's what I was arguing then, and that's what I'm arguing now, and that's what's in our brief. The value of our mineral interest has declined because they locked up the market with these 30% royalty agreements. So while there may be different values of the leases depending on a particular square of land, the argument is that they're all depressed. Whatever they were, they're lower because of these intracompany leases. Am I understanding that correct? You are absolutely correct. There are several steps that they took, and let's start with the basics. They have something called a secure capture program. You just don't see stuff like this in antitrust cases. I've been involved in a number of them. It's beyond belief that they label their activities as lock up the market, make it so they're on their knees, they have to come to us, they have to negotiate on a term, or we can shut it down altogether. We're gonna shut down the land grant production in eastern Wyoming County. Now, under those- So is that your interpretation, or do you have documents of theirs from discovery that say that? We have documents. Okay. We're in the record. They're in the record, Your Honor. At the end of our appendix are the slides we produced for the district court which are admitted into evidence which have all these codes and the documents that they relate to. This is a standard practice that they entered into. They wanted to lock it up, and the evidence is that they took many affirmative steps. This case started before the leasing arrangement when they started taking out the application for permission to drill, and then did no drill. And so- The district court, that issue is off the table now. We're just looking now at the intra-company leases and the antitrust impact of that. Well, yes and no, Your Honor. If I can make a small point on that. What the district court said, and I think properly, we disagreed with their interpretation of the state action issue. But assuming that she's right on that, what she said was it's evidence in furtherance of the desire to lock up the market. It can't be an element of the offense as such. So it's an evidentiary piece. She gave us that, and then she carved the timing of the class, when the class began, exactly to when the intra-company leases began. I want to circle around to your thing because I do have some concern in the district court's opinion, the references to an inference in favor of an antitrust impact here. And I don't know that that is a fair application of that section one conspiracy price-fixing case to this situation. And so I'd like to know what your response is to that. First of all, do you think the court actually relied on an inference here, or did it go forward and actually make a separate determination? And if it did rely on an inference, is that legal error? I don't believe the court relied on the inference. She quoted the language from this court in your thing that when you have a market infected by anti-competitive activity, it tends to affect all negotiations that happen, including in your thing where you had a great, the record showed a great number of individual negotiations done one by one. And basically what this court said, which is economic common sense, is that all of these were bargained in the shadow of the infected market conditions. But the court, beginning with page 15 of its opinion, goes through seven pages of fact-finding on what were the elements of liability, what were the elements of impact. And again, we are here on 23 F appeal, so it's not that we're gonna win on these. I certainly hope that we will, and I believe we will, but that's irrelevant at this stage, under Amgen and all the other cases. The question is, how are we going to prove it? And in footnote 11 of the district court's opinion, you see the statement quite clearly that Anadarko did this across the board. They applied the 30% leasing arrangement to every piece of property that they could handle within their two subsidiaries contracting with each other. So she made findings as to how we would prove the uniformity of the conduct by Anadarko Occidental and then the impact. And now, the impact then may break down in terms of some land may be better, some land may be worse. But the key finding at this point is they didn't go out and find who had water on their land or anything else. They imposed a 30% intercompany leases across the board. And what the district court found was not that they would choose relying on presumption, that if there's any antitrust violative activity there would be impact across the board. She was looking at how our experts proposed to prove this. And on this court, if I may, Your Honor, it's important to emphasize there was no damper challenge here. And so this is very much puts us in the position of the Tyson Foods case in the Supreme Court. In the Supreme Court, emphasizing Tyson Foods, that you had a B3 case that went to trial with the damaged component left over. They had to establish whether dining and doffing, putting on the utility clothes was going to be a common violation, was subject to the Fair Labor Standards requirements and so forth. Under those circumstances, the court knows there's no damper challenge. Therefore, the plaintiffs are entitled to go and try to prove damages in the way that their expert says. And if it fails, it fails. That's what trials are for. In the Bumblebee case in the Ninth Circuit, on Bonner just recently, there was also no damper challenge. And so the court said that the only issue before the trial court on the certification of B3 class was whether the plaintiff's methodology could be found to offer a way to try the liability on a unified basis. And it's not a question that they have their experts and that their experts disagree with us. These are very fine lawyers. They can't find experts to disagree with ours. They'd be shot, right? So they, of course the experts are going to disagree. But the question before the court is, is there evidence of how we will establish the liabilities by common proof? And do those predominate under the circumstances? And the district court made categorical findings in our favor on each of those. And the fact that defendants have an alternative methodology, the fact that they want to contest water saturation of the land on the damages component, that's fine. And if I can, just one more thing on that. Before you do, let me ask you a question. I don't even know how these play out, but let me just ask you a couple. So when Anadarko, after they implemented these 30% royalty rates, and they went and tried to tie up all of the spacing units, for lack of a better term, out there, did any of your clients protest the spacing units? Some of our clients made protests with the Wyoming regulatory authorities. I don't know whether it was on the spacing units as such. Or the APDs, or wherever they were able to do it. There were lots of concerns over the APDs expressed by our clients, and expressed by rival firms who said, hey, wait a second. They can't do this. And then they can't do the 30% leases, because that makes it impossible for us to do anything there. And basically, the Wyoming Regulatory Commission responded, that's beyond our power. Our power is only to register. And if I remember, is it the requirement in Wyoming that if your clients were unleased, and Anadarko wanted to force-pool them, that they had to offer to lease your clients? And so Anadarko, in fact, did offer to lease your clients' interests at some point. At least some of them. I don't think the record quite supports that, because all of our clients are unleased. And there's no evidence of Anadarko having conducted any activity in our area that would have allowed forced leasing. So as far as I know, the record does not support that. That was not fully developed. But from the expert report of Dr. Wigglegreen, you have the methodology to make that determination. Okay, thank you. I see my time is up. If there are no further questions. Thank you. Thank you very much, ma'am. Thank you, Your Honors. Very briefly, we agree that their burden is to show common evidence can predominate on the elements of their claim. But what they have is a presumption from the district court and what they are calling intent evidence. The district court did apply this presumption. She changed some of the words. She took out price fixing and added antitrust. But she applied that presumption. That is what the whole thing was. And the plaintiffs repeatedly, throughout their appellee brief, repeatedly refer not to the reduction of value in the legal interest, but the lack of lease bonuses and lack of royalty payments. I can give Your Honor multiple page sites for their appellee brief, but you will see it in there. The court had the obligation to do a rigorous analysis. We don't have to make a Daubert challenge. There are circuits that do talk about Dauberts being made in the context of class certification. This is not one of them. Daubert was not required. We did not have to do it. The court, it's not a substitute for 23B3. The court had to engage in a rigorous analysis and she just did not do that. Thank you. Thank you. We will take this matter under advisement and take.